**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT SCHOFIELD,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:CV-03-0357** |
| | : | **(JUDGE VANASKIE)** |
| **METROPOLITAN LIFE INSURANCE** | : | |
| **COMPANY, ROBERT PIDICH,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Plaintiff Robert Schofield initiated this action against his former employer, Metropolitan Life Insurance Company ("MetLife"), and three of MetLife's employees - Robert Pidich, Rose C. Johnston, and Kellee Tinsley - complaining of improper handling of his leave of absence during the winter of 2001 and his ensuing separation from employment in May of 2002.  This Court previously dismissed Plaintiff's claims against Ms. Johnston and Ms. Tinsley, as well as claims of intentional infliction of emotional distress, wrongful discharge, and violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001, et seq.  Schofield v. Metropolitan Life Ins. Co., No. 3:CV-03-0357 (Dkt. Entry 45) (M.D. Pa. Dec. 16, 2003).

Remaining Defendants MetLife and Mr. Pidich have moved for summary judgment on Mr. Schofield's claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq. (Count I); the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, et seq. (Count II); the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. C.S.A. § 951, et seq.

(Count III); and the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, et seq. (Count IV).[1]

Because Mr. Schofield does not present sufficient evidence from which a fact-finder could conclude that his position changed following his return from FMLA leave or that his leave was a factor behind MetLife's actions that led to his voluntary resignation, his FMLA claim must fail. Likewise, Mr. Schofield has failed to present sufficient evidence that his voluntary resignation constituted an adverse employment action by MetLife or that MetLife acted with discriminatory animus in order to prevail on his discrimination claims.  Consequently, MetLife's motion for summary judgment will be granted.

## I.  BACKGROUND

MetLife operates an information technology center in Clarks Summit, Pennsylvania. (Defs.' Statement of Material Facts ("S.M.F.") (Dkt. Entry 71-2) ¶ 1.)  The facility employs about forty project managers to manage various software projects.  (Id. ¶ 2.)

In 1997, Mr. Schofield became a project manager at the facility.  (Id.)  In this position, he was responsible for hiring, managing, evaluating, and terminating a team of programmers, system consultants, and other information technology professionals.  (Id. ¶ 3.)  Kellee Tinsley was a highly regarded member of his team.  (Id. ¶¶ 5-6.)  Mr. Schofield reported directly to MetLife Director Robert Pidich.  (Id. ¶ 4.)

---

[1] For purposes of convenience, the remaining Defendants, MetLife and Mr. Pidich, will be collectively referred to as MetLife in this opinion, as they moved together for summary judgment.

Mr. Schofield began experiencing severe anxiety and depression in 2001.  (Pl.'s Counter

Statement of Material Facts ("C.S.M.F.") (Dkt. Entry 71-2) ¶ 17.)  Due to his illness, he missed

work for most of the month of December 2001.  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A

(Dkt. Entry 72-2) at 149-150.)  Mr. Schofield was eventually placed on disability leave effective

January 2, 2002.  (Defs.' S.M.F. ¶ 17.)  On January 18, 2002, Mr. Schofield attempted suicide.

(Pl.'s C.S.M.F. ¶ 20.)

On April 1, 2002, Mr. Schofield returned to his project manager position.  (Defs.' S.M.F.

¶¶ 25-26.)  Ms. Tinsley and Mr. Pidich agreed to cover for Mr. Schofield if he needed to leave

work temporarily due to his illness.  (Id. ¶ 28.)  During April and May, Mr. Schofield occasionally

missed work due to his illness.  (Id. ¶¶ 31-37.)  Mr. Pidich continued to consider Mr. Schofield

one of the best managers at the facility.  (Id. ¶ 38.)

Mr. Schofield and Ms. Tinsley had a friendly relationship. (Id. ¶ 39.)  Mr. Schofield,

however, felt that Ms. Tinsley became temperamental after she was promoted to a project

manager position in 2001.  (Id. ¶ 40.)  According to Mr. Schofield, she subsequently became

upset over trivial matters and often snapped at him, only to later apologize.  (Id. ¶ 43; Pl.'s

C.S.M.F. ¶¶ 40, 43.)

During a conversation between Mr. Schofield and Ms. Tinsley on April 15, 2002, Mr.

Schofield noted that he had seen her smoking cigarettes at a colleague's wedding.  (Defs.'

S.M.F. ¶ 41.)  Ms. Tinsley became upset and told Mr. Schofield to "mind his own business."

(Id. ¶ 42.)

On April 26, 2002, Ms. Tinsley sent an email to Mr. Schofield stating that she "did not

mean to snap" at him and may have been "a little harsh" with him.  (Ms. Tinsley's April 26, 2002

email, Saloman Cert. Ex. 13  (Dkt. Entry 57-5).)  Mr. Schofield wrote a lengthy response to Ms.

Tinsley's email in which he attempted to explain how her reaction made him feel and why he

mentioned her smoking.  (Mr. Schofield's April 26, 2002 email, Defs.' Br. Ex. 13  (Dkt. Entry 57-

5).)  In the email, he stated that he had "a very strong attachment and affection" for Ms. Tinsley

and that she came "second only to [his] wife."  (Id.)

During a conversation on April 29, 2002, Ms. Tinsley informed Mr. Schofield that she did

not want to be treated differently based on his personal affection for her.  (Defs.' S.M.F. ¶ 49.)

Mr. Schofield continued to send Ms. Tinsley emails unrelated to work.  (Id. ¶¶ 51, 54.)

On May 2, 2002, Mr. Schofield sent Ms. Tinsley another email titled, "All or nothing."

(Mr. Schofield's April 26, 2002 email, Defs.' Br. Ex. 17  (Dkt. Entry 57-6).)  It began with the

following prefatory statements in bold print:

> Don't read this if you are involved in something important.  Wait till
> you have some free time to deal with it.

(Id.)  Mr. Schofield expressed confusion as to why she had declined his offers to come with her

husband to his house for a social visit.  (Id.)  He also expressed gratitude for her "help, patience

and consideration" with his illness, but cautioned that his recovery was not complete and

4

cryptically stated that "Option 'B' is still a serious consideration."[2]  (Id.)  Mr. Schofield further

wrote:

> I have been very open about how I have come to regard you.  I
> would like to know how you see me.
>
> Sorry to put this on you but I'm sure you can understand I can't
> stand not knowing the whole picture and being able to make sense
> out of it.  That usually gets me in trouble but that's the way it is.

(Id.)

After reading Mr. Schofield's email, Ms. Tinsley became upset and left work.  (Defs.'

S.M.F. ¶ 62.)  She feared that Mr. Schofield was a threat to her safety.  (Id.)  She contacted

MetLife's Human Resources Generalist, Rose Johnston, and complained about Mr. Schofield's

actions.  (Id. ¶¶ 64-66.)  Mr. Pidich also reported Ms. Tinsley's concerns to Human Resources

and Mark Davis, a MetLife Vice President, (Id. ¶ 67.)  Ms. Johnston accepted Ms. Tinsley's

complaint of harassment and hostile work environment, and undertook to investigate the

complaint.  (Id. ¶ 68.)

Mr. Schofield inquired of Mr. Pidich about Ms. Tinsley's absence from work on Friday,

May 3rd.  (Id. ¶ 70.)  When Mr. Schofield pressed Mr. Pidich as to whether Ms. Tinsley was ill,

Mr. Pidich told him to "just let it go . . . ."  (Id. ¶ 71.)  Mr. Schofield, rather than accepting this

advice, sent Ms. Tinsley an email to her home.  (Defs.' Br. Ex. 19 (Dkt. Entry 57-6).)  He sent

---

[2]  According to Mr. Schofield and his wife, "Option 'B'" meant he would take time off from
MetLife or retire.  (Defs.' S.M.F. ¶¶ 57-58.)  Ms. Tinsley and Mr. Pidich, however, believed
"Option 'B'" meant Mr. Schofield might attempt suicide again.  (Id. ¶ 59.)

her another email on May 6, 2002, entitled "Please read this!"  (Defs.' Br. Ex. 20 (Dkt. Entry 57-6).)  In this email, Mr. Schofield said:

> If you want I'll resign so you don't have to work with me anymore.
> No matter what, you don't deserve to be upset because of me.
> Talk to me, please!

(Id. (emphasis added).)

On May 7, 2002, Ms. Johnston met with Mr. Schofield and Mark Davis to discuss the complaint.  (Defs.' S.M.F. ¶ 77.)  Mr. Schofield admits that Ms. Johnston made clear that the discussion had nothing to do with the possible termination of his employment.  (Id.)  Mr. Schofield, however, interrupted the meeting shortly after it was commenced, saying "Let me save you some time.  I cannot deal with this right now.  I'm out of here."  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200.)  He put his security pass down on the table in the conference room and went home.  (Id. at 200-01.)  Mr. Davis believed that Mr. Schofield had just quit.  (Davis Aff., Dkt. Entry 76-1, at ¶ 9.)

Ms. Johnston also interpreted Mr. Schofield's actions as indicating that that he had resigned.  (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5) at 33.)  She began processing Mr. Schofield's resignation that same day.  (Id. at 36; Letter dated May 7, 2002, Defs.' Br. Ex. 21 (Dkt. Entry 57-6).)

Mr. Schofield contacted Ms. Johnston the next day and wished to discuss the situation further.  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 215.)  On May 9, 2002,

6

Mr. Schofield met with Ms. Johnston and Mr. Pidich.  (Defs.' S.M.F. ¶ 88.)  The three of them explored options for reinstating Mr. Schofield.  (Id. ¶ 93.)  Ms. Johnston and Mr. Pidich informed Mr. Schofield that he could be reinstated only if he limited his interaction with Ms. Tinsley, which would likely have required Mr. Schofield to be transferred to another team.  (Id.)  Mr. Schofield left the meeting without reaching an agreement for reinstatement.[3]  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 223-26.)

Later that day, Mr. Schofield, Ms. Johnston, and Mr. Pidich had a telephone conference during which Mr. Schofield requested unconditional reinstatement until Ms. Tinsley decided whether to return to MetLife, and if she did return, that Ms. Tinsley be placed on "special assignment" while Mr. Schofield and MetLife explored a retirement package.  (Defs.' S.M.F. ¶ 99.)  This was the last meeting between MetLife and Mr. Schofield concerning the possibility of his reinstatement.

On February 26, 2003, Mr. Schofield filed a complaint in this Court, asserting employment discrimination (Counts I, II, and II), violation of the FMLA (Count IV), violation of ERISA (Count V), intentional infliction of emotional distress (also labeled as Count V), and wrongful discharge (Count VI).  (Compl. (Dkt. Entry 1).)  This Court previously dismissed Mr. Schofield's ERISA, intentional infliction of emotional distress, and wrongful discharge claims.

---

[3]  Mr. Schofield says he left the meeting after Ms. Johnston asked him to sign a paper saying the emails he sent were inappropriate. (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 223-26.)  Ms. Johnston denies she made this request.  (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5) at 59-60.)

Schofield v. Metropolitan Life Ins. Co., No. 3:CV-03-0357 (Dkt. Entry 45) (M.D. Pa. Dec. 16,

2003). Defendants have moved for summary judgment on all remaining claims. (Dkt. Entry

53.) The Motion has been fully briefed and is now ripe for decision.

## II. DISCUSSION

MetLife argues it is entitled to summary judgment on Mr. Schofield's FMLA claim

because he has failed to show a violation of the Act as he was returned to his project manager

position following his leave of absence. MetLife also claims that Mr. Schofield did not suffer an

adverse employment decision because he voluntarily resigned and that, in any event, he has

failed to demonstrate that age or disability discrimination played a role in his separation from

employment.

### A.   Summary Judgment Standard

Summary judgment should be granted when "the pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a judgment as a

matter of law." FED. R. CIV. P. 56(c). A fact is "material" if proof of its existence or

nonexistence might affect the outcome of the suit under the applicable law. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986). An issue is genuine "if the evidence is such that a

reasonable jury could return a verdict for the nonmoving party." Id.

All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to nonmoving party. Cont'l Ins. Co. v. Bodie, 682 F.2d 436, 438 (3d Cir. 1982). The moving party has the burden of showing the absence of a genuine issue of material fact, but the nonmoving party must present affirmative evidence from which a jury might return a verdict in the nonmoving party's favor. Anderson, 477 U.S. at 256-57. Merely conclusory allegations taken from the pleadings are insufficient to withstand a motion for summary judgment. Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990). Summary judgment is to be entered "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

### B.    The FMLA Claim

The FMLA grants eligible employees 12 weeks of leave in a 1-year period for certain events, including a disabling health problem. 29 U.S.C. § 2612(a)(1). Upon return from such leave, "the employer must reinstate the employee to his or her former position or an equivalent." Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 86 (2002) (citing 29 U.S.C. § 2614(a)(1)).

Mr. Schofield claims that MetLife violated the FMLA by not returning him to his previous

position or an equivalent position when he returned from his medical leave on April 1, 2002. (Compl. (Dkt. Entry 1) ¶ 89.)  MetLife has moved for summary judgment on this claim, asserting that Mr. Schofield was returned to his previous position of project manager.  (Defs.' Br. (Dkt. Entry 54) at 3-4.)  The evidence does indeed establish that Mr. Schofield was returned to his previous position upon his return from his FMLA leave.  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 266-67.)[4]

Mr. Schofield nonetheless maintains that MetLife violated the FMLA.  He bases his argument on a conversation he had with Mr. Pidich in March 2002, in which Mr. Pidich told him that he "probably won't be coming back [to his] project manager position. . . . because of [his] illness."  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 271.)  Instead, Mr. Schofield would be retained as a consultant and another person would take over his project

---

[4]  MetLife submitted the following deposition testimony by Mr. Schofield:

> Q: Now, when you returned from the conclusion of your FMLA leave, you were returned to the same project manager position that you held prior to you leaving in December or January, right?
>
> A:  Yes.
>
> Q: And the duties and responsibilities were the same as when you left as when you returned?
>
> A: Yes.

(Id.)

manager position.[5]  (Id.)

Regardless of what was said, Mr. Schofield was returned to his project manager position following his medical leave of absence.  A request, offer, or threat to change positions is not an adverse employment action to warrant recovery under the FMLA.  See Ajayi v. Aramark Business Services, Inc., 336 F.3d 520, 531 (7th Cir. 2003) ("An unfulfilled threat, which results in no material harm, is not [a] materially adverse [employment action]").  This argument, consequently, has no merit.

Mr. Schofield alternatively argues that "there was a definite plan, scheme and design to release him or assign him to another job and replace him" after he was returned to his project manager position.  (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 9.)  Specifically, Mr. Schofield alleges that MetLife's handling of Ms. Tinsley's harassment complaint was connected to his medical leave.  Consequently, Mr. Schofield appears to be pursuing a retaliation claim under the FMLA.

An employer may not use the taking of FMLA leave as a negative factor in employment decisions.  Conoshenti v. Public Service Elec. & Gas Co., 364 F.3d 135, 146 (3d Cir. 2004).  In order to succeed on a retaliation claim under the FMLA, a plaintiff must show that (1) he took leave under the Act, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave.  Id.  MetLife argues that Mr. Schofield has failed to

---

[5]  It is likely that Mr. Pidich was offering Mr. Schofield the consultant position as a less stressful alternative to the project manager position to accommodate Mr. Schofield's severe anxiety.

present sufficient evidence from which a fact-finder could determine that MetLife's handling of Ms. Tinsley's complaint was causally connected to his leave.[6]  (Defs.' Reply Br. (Dkt. Entry 76-1) at 3-4.)

Mr. Schofield asserts that a causal connection was established based on the short duration of time (a little more than one month) between his return from leave and MetLife's handling of Ms. Tinsley's harassment claim, which led to his departure from MetLife.  Courts are hesitant to infer a causal connection between an alleged retaliatory action and the taking of FMLA leave based on temporal proximity alone.  See Weston v. Pennsylvania, 251 F.3d 420, 431 (3d Cir. 2001) ("With one exception, we have never held that timing alone can be sufficient to establish causation.")  Consequently, most Courts require that the timing of the alleged retaliatory action to be "unusually suggestive of retaliatory motive before a causal link will be inferred."  Williams v. Philadelphia Housing Authority Police Dept., 380 F.3d 751, 760 (3d Cir. 2004) (citing Shellenberger v. Summit Bancorp, Inc., 318 F.3d 183, 189 n.9 (3d Cir. 2003); see also Washco v. Federal Express Corp., 402 F. Supp. 2d 547, 559 (E.D. Pa. 2005).

---

[6]  MetLife also challenges whether Mr. Schofield suffered an adverse employment action, arguing that he voluntarily resigned.  Indeed, an employee cannot claim that he suffered an adverse employment decision under the FMLA when he voluntarily resigns.  See Hammon v. DHL Airways, Inc., 165 F.3d 441, 447 (6th Cir. 1999).  Because this Court finds it clear that Mr. Schofield's asserted adverse employment action was not connected to his leave, this Court will deny his claim under the FMLA without determining whether he suffered a sufficiently adverse retaliatory act.  It should be noted that actionable retaliatory conduct is not synonymous with an adverse employment action for purposes of a discrimination claim.  See Moore v. City of Philadelphia, __ F.3d __, 2006 WL 2492256, at *7-8 (3d Cir. 2006).

This typically requires that the alleged retaliatory action occurred within days of the protected activity.  For instance, in Jalil v. Avdel Corp., two days between the protected activity and the alleged retaliation was found to be sufficient to support an inference of a causal connection.  873 F.2d 701, 708 (3d Cir. 1989); but see Weston, 251 F.3d at 431 n.5 (distinguishing Jalil as being "limited to the unusually suggestive facts of the case").  In contrast, a ten day separation between the protected activity and the alleged retaliation was not sufficient to support an inference of a causal connection in  Newman v. Dollar Bank, No. Civ.A. 04-1163, 2006 WL 895089, at *6 (W.D. Pa. March 31, 2006).

In this case, over a month elapsed between the time Mr. Schofield returned from his medical leave and the alleged retaliatory action.  In Williams, the Court advised that "where 'the temporal proximity is not so close as to be unduly suggestive,' . . . 'timing plus other evidence may be an appropriate test.'"  380 F.3d at 760 (quoting Thomas v. Town of Hammonton, 351 F.3d 108, 114 (3d Cir.2003)).  Williams involved a two month separation between the alleged retaliatory action and the protected conduct.  Id.  The Williams Court ultimately determined that the plaintiff did not establish a causal connection because he did not put forth any other evidence suggesting a retaliatory animus, and the defendant's alternative explanation for plaintiff's termination was "quite compelling."  Id..

Similarly, Mr. Schofield has failed to put forth any other evidence suggesting a connection between MetLife's handling of Ms. Tinsley's harassment claim and his medical

leave.  In fact, MetLife was accommodating to Mr. Schofield's request for medical leave, as Mr. Pidich and Ms. Tinsley offered to cover for him if he felt he needed additional time off after he returned from his FMLA leave.  (Defs.' S.M.F. ¶ 28.)

Moreover, Mr. Schofield has presented no evidence to challenge MetLife's articulated non-retaliatory reason for investigating Ms. Tinsley's harassment complaint.  There is no dispute that Mr. Schofield engaged in a series of communications that resulted in Ms. Tinsley asserting a harassment complaint.[7]  MetLife had an obligation to investigate Ms. Tinsley's complaint against Mr. Schofield.  MetLife also had a legitimate basis for requesting that Mr. Schofield limit his interaction with Ms. Tinsley during the investigation.[8]  Other than his own conclusory allegations, Mr. Schofield has presented no evidence from which a fact-finder could conclude that MetLife's articulated reasons for its actions were tied to his FMLA leave. MetLife's motion for summary judgment, therefore, will be granted on this claim.

---

[7]  Mr. Schofield does argue that Ms. Tinsley's reaction was unjustified.  Regardless of whether Ms. Tinsley's reaction was appropriate or not, MetLife had a reasonable basis to investigate the complaint.  See Andy v. United Parcel Service, Inc., 111 Fed. Appx. 670 (3d Cir. 2004) (It is "the perception of the decision maker, which is 'what matters.'").

[8]  MetLife asked Mr. Schofield to switch teams rather than Ms. Tinsley because it was MetLife's policy that an accuser's position cannot be altered while resolving a harassment claim.  (Mr. Pidich's Dep., Pl.'s Br. Opp. Ex. D (Dkt. Entry 73-2) at 57.)

C.    The Discrimination Claims

MetLife has also moved for summary judgment on Mr. Schofield's claims that MetLife unlawfully terminated his employment based on his age or disability.  In employment discrimination cases, the Third Circuit has applied a slightly modified version of the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden shifting framework.  See, e.g., Taylor v. Phoenixville School Dist., 184 F.3d 296, 306 (3d Cir. 1999) (analyzing an ADA claim); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997) (en banc) (analyzing an ADEA claim); Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d Cir. 1995) (analyzing an ADEA claim).  Under this scheme, the plaintiff must first present sufficient evidence to establish a prima facie case of discrimination.  A plaintiff establishes a prima facie case of discrimination by showing that: (1) he was a member of a protected class (i.e., was over forty years old under the ADEA or was disabled under the ADA); (2) he was qualified for the position in question; (3) he suffered an adverse employment decision, such as discharge; and (4) the adverse decision occurred under circumstances giving rise to an inference of discrimination.  See Sarullo v. U.S. Postal Service, 352 F.3d 789, 797 (3d Cir. 2003); Taylor, 184 F.3d at 306; Sempier, 45 F.3d at 728.

If the plaintiff is able to show a prima facie case of discrimination, "the burden of production (but not the burden of persuasion) shifts to the defendant."  Keller, 130 F.3d at 1108. The defendant must then offer evidence that is sufficient to support a finding that it had a

15

legitimate, non-discriminatory reason for the discharge.  Id.  If the defendant fails to do so, judgment must be entered for the plaintiff.

If the defendant offers evidence of a legitimate, non-discriminatory reason for the adverse employment decision, the burden shifts back to the plaintiff.  To survive summary judgment, the plaintiff must produce evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action."  Fuentes v. Perskie, 32 F.3d 759, 764 (3d Cir. 1994).

MetLife argues that Mr. Schofield did not suffer an adverse employment decision because he voluntarily resigned.  (Defs.' Br. (Dkt. Entry 54) at 5-10 (citing, inter alia,  Acosta v. Catholic Health Initiatives, Inc., No. CIV.A. 02-1750, 2003 WL 176978, at *15 (E.D. Pa. Jan. 24, 2003) (holding that an employee's voluntary resignation after an evaluation did not constitute an adverse employment action).)  Mr. Schofield denies that he resigned.  According to him, he left the meeting because he was upset, confused, and embarrassed by Ms. Tinsley's harassment allegations and the manner in which MetLife confronted him with the allegations.  He could not handle discussing the issue at that time.  He asserts that he intended to come back to work when the problems got straightened out.  (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 10-11.)

As MetLife observes, Plaintiff's undisclosed intention that he was not quitting his job or his belief as to how his actions should have been perceived by others attending the meeting of

May 7, 2002, is not controlling.  It is the perception of the employer that matters.  See Andy v. United Parcel Service, Inc., 111 Fed. Appx. 670, 671 (3d Cir. 2004).  In this case, Mr. Schofield's statement – "Let me save you some time.  I cannot deal with this right now.  I'm out of here."  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200)– coupled with his action of turning in his identification card, certainly indicated that he had indeed resigned. Clearly, it was not unreasonable for either Ms. Johnston or Mr. Davis to have regarded Mr. Schofield's statement and action as indicating that he had quit.  Both his words, "I'll save you some time . . . .  I'm out of here," and his action, turning in his identification card, manifested an intent to resign.  See Hammon v. DHL Airways, Inc., 165 F.3d 441, 448 (6th Cir. 1999) (noting that an employee resigns when he "express[es] an intention to resign" and "take[s] some action to demonstrate that he is relinquishing his position"); Gauden v. Borough of Roscoe, 470 A.2d 191, 193 (Pa. Commw. Ct. 1984) (same, based on Pennsylvania law).  His undisclosed intention to return to employment when the matter was somehow resolved does not alter the perception of the MetLife decision maker, "which is 'what matters.[9]'" Andy, 111 Fed. Appx. at 671.

        An employee who voluntarily resigns cannot show that he or she has suffered an

_____

        [9]  Significantly, Ms. Johnston immediately began processing Mr. Schofield's resignation after the meeting, indicating that her perception was that Mr. Schofield had resigned. Moreover, it was Mr. Schofield–not MetLife–which initiated reinstatement talks, further signifying that MetLife believed Mr. Schofield had resigned.

adverse employment decision at the hands of the employer.  See, e.g., Hammon, 165 F.3d at 448; Iadanza v. Bell Atlantic Network Services, Inc., No. CIV. A. 96-2789, 1998 WL 122249, at *4-5 (E.D. Pa. March 10, 1998), aff'd, 191 F.3d 445 (3d Cir. 1999); Sherrod v. Philadelphia Gas Works, 209 F. Supp. 2d 443, 449-50 (E.D. Pa. 2002); Acosta v. Catholic Health Initiatives, Inc., No. CIV.A. 02-1750, 2003 WL 176978, at *15 (E.D. Pa. Jan. 24, 2003).  Because Mr. Schofield has failed to present evidence sufficient to cast doubt on the assertion of the MetLife decision makers (Johnston and Davis) that they regarded his action as signifying an intention to resign, MetLife is entitled to judgment in its favor.

MetLife did not act improperly either, when it did not accept Mr. Schofield's decision to rescind his resignation.  Failure to accept a previous employee's rescission of his voluntary resignation is not an adverse employment action for the simple reason that the employment relationship has ended   See MacLean v. City of St. Petersburg, 194 F. Supp. 2d 1290, 1300 (M.D. Fla. 2002).  Mr. Schofield has failed to show a genuine dispute of fact material to the question of whether MetLife subjected him to an adverse employment action, and, on this ground alone, MetLife is entitled to judgment in its favor.

Even if there was a genuine dispute material to the question of whether Plaintiff had been discharged, as opposed to voluntarily quitting, he has failed to produce evidence from which a fact-finder could reasonably disbelieve MetLife's proffered reasons for its actions, or believe that an invidious discriminatory reason was more likely than not a motivating cause of

18

MetLife's actions.

Plaintiff claims that he suffered adverse employment actions when MetLife: (1) mistakenly processed his resignation, which had the effect of terminating his employment, and (2) conditioned his reinstatement on limiting his contact with Ms. Tinsley, perhaps requiring him to transfer to another team.  MetLife asserts that it had legitimate, non-discriminatory reasons for its actions.  Specifically, it was attempting to respond to Ms. Tinsley's complaint against him.

MetLife has presented sufficient evidence to support its assertion.  After receiving a complaint from Ms. Tinsley about Mr. Schofield's behavior, MetLife's Human Resources Generalist, Rose Johnston, initiated an investigation.  (Defs.' S.M.F. ¶ 68.)  Ms. Johnston met with Mr. Schofield and MetLife Vice President, Mark Davis, to discuss the complaint on May 7, 2002.  (Defs.' S.M.F. ¶ 77.)  Shortly after the meeting began, Mr. Schofield interrupted, "I'll save you some time.  I cannot deal with this right now.  I'm out of here."  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 200.)  He put his security pass down and went home.  (Id. at 200-01.)

Ms. Johnston thought Mr. Schofield intended to resign by his actions.  (Ms. Johnston's Dep., Defs.' Br. Ex. 12 (Dkt. Entry 57-5) at 33.)  She therefore initiated MetLife's resignation procedures.  (Id. at 36; Letter dated May 7, 2002, Defs.' Br. Ex. 21 (Dkt. Entry 57-6).)

Mr. Schofield contacted Ms. Johnston the next day and wished to discuss the situation further.  On May 9, 2002, Mr. Schofield met with Ms. Johnston and Mr. Pidich and explored

options for reinstatement.  (Defs.' S.M.F. ¶ 88.)  Ms. Johnston and Mr. Pidich felt it would be

necessary to limit Mr. Schofield's interaction with Ms. Tinsley given her ongoing complaint.  An

agreement could not be reached for reinstating Mr. Schofield.

Mr. Schofield fails to present any evidence that casts serious doubt on MetLife's

proffered reasons for its actions.  He attempts to undermine MetLife's rationale by arguing that

Ms. Tinsley's reaction was unreasonable.  (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 15-16.)  But

regardless of whether Ms. Tinsley had a reasonable basis for her complaint or not, MetLife had

an obligation to investigate the claims.[10]  Indeed, MetLife had a basis for taking the complaint

seriously, as Ms. Tinsley was missing work out of fear of Mr. Schofield.  (Ms. Johnston's Dep.,

Defs.' Br. Ex. 13 (Dkt. Entry 57-5) at 18-27; Ms. Tinsley's Dep., Defs.' Br. Ex. 15 (Dkt. Entry 57-

6) at 41-50).)  Mr. Schofield has not presented sufficient evidence from which a fact-finder

could reasonably infer that MetLife's proffered reasons "was either a post hoc fabrication or

otherwise did not actually motivate the employment action."  Fuentes v. Perskie, 32 F.3d 759,

764-65 (3d Cir. 1994) (setting forth the evidentiary standard for a plaintiff to survive summary

judgment).

Support for this conclusion is found in Andy v. United Parcel Service, where the plaintiff

---

[10]  Even if MetLife's decision to investigate Ms. Tinsley's complaint was mistaken, it does not demonstrate that MetLife discriminated against Mr. Schofield.  See Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994) ("To discredit the employer's proffered reason, however, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

also attempted to attack the validity of the defendant's proffered legitimate, non-discriminatory reason for terminating him–namely, the plaintiff engaged in an inappropriate relationship at work.  2003 WL 22697194.  The Court cautioned that "the issue of whether or not Defendants held a mistaken belief regarding Plaintiff's relationship with Alison plays no role in the decision of this Court."  Id. at *9 (citing Fuentes, 32 F.3d at 765).  Instead, the Court focused on whether the perceptions of the defendant's managers indicated a discriminatory animus.  Id.  The plaintiff, though, failed to cast "doubt on his supervisors' contention that they acted only pursuant to the perceived existence of an inappropriate relationship."  Id.  Consequently, the Court concluded that the defendant had a legitimate reason to be concerned about the relationship and granted summary judgment in its favor.  Id.  at *13-14.

An identical conclusion is compelled here.  Regardless of Mr. Schofield's undisclosed intentions with respect to his communications with Ms. Tinsley, she certainly had grounds to complain to MetLife and it had a legitimate basis for addressing her complaint.  Moreover, the fact that it suggested conditions for his reinstatement by limiting his access to Ms. Tinsley belies any assertion that age or disability bias animated some convoluted scheme to remove Mr. Schofield from MetLife's payroll.

Significantly, Plaintiff has not pointed to any evidence of a similarly situated younger or non-disabled person who was treated more favorably.  The mere fact that his employment relationship ended and he is in a protected class is not sufficient to raise an inference of

discrimination where, as here, the employment relationship was terminated as an incident to an inquiry concerning emails that seriously disturbed a co-worker, and Plaintiff can point to no evidence that some other person who had engaged in similar behavior was Plaintiff was treated more favorably.  Id. at *12.

Mr. Schofield nonetheless argues that age or disability discrimination was more likely than not a motivating factor in MetLife's actions due to remarks he attributes to MetLife employees.  In support of his age discrimination argument, Mr. Schofield states that Mr. Pidich told him that MetLife "was targeting employees over 50 for termination like other large corporations."  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 261-64; Pl.'s Br. Opp. (Dkt. Entry 71-1) at 12.)  Mr. Schofield also asserts his own perception that MetLife was disproportionately terminating employees over fifty.  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 262-64.)  Mr. Pidich, who no longer works for MetLife, did not "remember specifically saying" that MetLife was targeting employees over fifty, though he did not believe the evidence pointed to such a conclusion.  (Mr. Pidich's Dep., Defs.' Br. Ex. 5 (Dkt. Entry 57-4) at 69.)  Mr. Schofield did not point to any other relevant evidence of age discrimination in his brief.[11]

---

[11]  Mr. Schofield also cited an affidavit of a MetLife employee from a different state for the conclusion that MetLife "had a program to reduce ratings of older employees to justify their termination."  (Pl.'s Br. Opp. (Dkt. Entry 71-1) at 13.)  Mr. Schofield fails to show how these conclusory allegations of a scheme to reduce the ratings of older employees in New Jersey are relevant to his case.  Mr. Schofield was not terminated for a low rating, he was investigated for harassing a co-worker.  This other employee's affidavit fails to show that age was a motivating

This is insufficient evidence to support a finding of age discrimination.  "Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision."  Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 545 (3d Cir. 1992); see also Bullock v. Children's Hosp. of Philadelphia, 71 F. Supp. 2d 482, 486 (E.D. Pa. 1999) ("As a general matter, comments, even by a decision-maker, will not constitute direct evidence of discrimination, unless they are related to the decisional process itself.")  Mr. Pidich's statement is not connected to Mr. Schofield's abrupt departure from the MetLife office.

While Mr. Pidich was involved in the discussions to reinstate Mr. Schofield, Mr. Pidich's alleged statement fails to establish that age was a motivating factor in the discussion. Significantly, Mr. Schofield's statement does not even indicate that Mr. Pidich had a bias against older workers.  Instead, the statement appears to be complaining about such conduct. Indeed, Mr. Pidich was over fifty (50) years of age at the time.

Mr. Pidich and Ms. Johnston required that Mr. Schofield limit his contact with Ms. Tinsley to conform to MetLife's policy to separate employees involved in a harassment complaint.  (Mr. Pidich's Dep., Pl.'s Br. Opp. Ex. D (Dkt. Entry 73-2) at 57; Johnston Aff. (Dkt. Entry 56) ¶ 2.) Mr. Schofield fails to present sufficient evidence from which a fact-finder could conclude that age was more likely than not a motivating factor behind MetLife's actions.  Consequently,

---

factor in the decision to investigate Ms. Tinsley's complaint against Mr. Schofield.

summary judgment is appropriate against Mr. Schofield for his age discrimination claim.

Similarly, Mr. Schofield attempts to support his disability discrimination argument by pointing to an alleged statement by Mr. Pidich that everything was Mr Schofield's fault "because [he] was sick."  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-3) at 283-84, Pl.'s Br. Opp. (Dkt. Entry 71-1) at 13-14.)  Again, Mr. Pidich was not involved in the decision to process Mr. Schofield's resignation, so this statement does not constitute evidence of disability discrimination in that decision.

Moreover, the evidence actually indicates that Mr. Pidich was supportive of Mr. Schofield's disability.  Mr. Pidich offered to cover for Mr. Schofield if he needed time off after coming back from his medical leave.  (Mr. Schofield's Dep., Pl.'s Br. Opp. Ex. A (Dkt. Entry 72-2) at 195.)  He also continuously praised Mr. Schofield's work product.

Mr. Schofield again fails to present sufficient evidence from which a fact-finder could conclude that discrimination played a role in MetLife's actions.  Rather, the evidence supports MetLife's articulated reasons for its actions - it was simply investigating Ms. Tinsley's complaint against Mr. Schofield.  Consequently, Mr. Schofield's discrimination claims will be dismissed.[12]

## III.  CONCLUSION

---

[12]  Mr. Schofield also asserted a claim for disability discrimination under the PHRA.  The analytical framework of an action under the PHRA is essentially identical to that of a claim under the ADA.  See Rinehimer v. Cemcolift, Inc., 292 F.3d 375, 382 (3d Cir. 2002); Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996).  Accordingly, the analysis of Mr. Schofield's ADA claim is equally applicable to his claim of disability discrimination under the PHRA.

For the reasons set forth above, Defendant's motion for summary judgment (Dkt. Entry 53) will be granted.  An appropriate Order follows.

<u>s/ Thomas I. Vanaskie</u>
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **ROBERT SCHOFIELD,** | : | |
| **Plaintiff** | : | |
| **v.** | : | **3:CV-03-0357** |
| | : | **(JUDGE VANASKIE)** |
| **METROPOLITAN LIFE INSURANCE** | : | |
| **COMPANY, ROBERT PIDICH,** | : | |
| **Defendants** | : | |

## ORDER

**NOW, THIS 15th DAY OF SEPTEMBER, 2006,** for the reasons set forth in the

foregoing Memorandum, **IT IS HEREBY ORDERED THAT:**

1. Defendants' motion for summary judgment (Dkt. Entry 53) is **GRANTED**.

2. The Clerk of Court is directed to enter judgment in favor of the remaining Defendants,

and to mark this matter **CLOSED**.

                                        **s/ Thomas I. Vanaskie**
                                        Thomas I. Vanaskie
                                        United States District Judge